Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiff, Allstate Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
ALLSTATE INSURANCE COMPANY,

                                        Plaintiff,

              -against-

JAY ALFRED SEITZ, PH.D.,

                        -and-

HK PSYCHOLOGICAL, P.C.,
KINGSHWY PSYCHOLOGICAL, P.C.,
JAY PSYCHOLOGICAL, P.C.,
OMEGA PSYCHOLOGICAL, P.C.,

                    (the "PC Defendants")

                        -and-

BEN L. ADLER,
ALEKSANDR GORMAKH,
MILANA GORMAKH,
PETER KERNER,
SHORI MATATOV,

                    (the "Management Defendants")

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Docket No.:_____ (        )

**Plaintiff Demands a
Trial by Jury**

## COMPLAINT

Plaintiff Allstate Insurance Company ("Allstate" or "Plaintiff"), by and through its counsel, Rivkin Radler LLP, as and for its Complaint against the Defendants, hereby alleges as follows:

## NATURE OF THE ACTION

1.    This action seeks to terminate an ongoing fraudulent scheme perpetrated against Allstate and the New York automobile insurance industry by a psychologist, psychology professional corporations, and non-psychologist laypeople who secretly and unlawfully own and control the psychology professional corporations. Succinctly:

(i)    the laypeople engage or "purchase" psychologists' licenses for a fixed sum, or some ongoing payment, or else steal the psychologists' identities, and then fraudulently incorporate psychology professional corporations under the psychologists' licenses;

(ii)    though the professional corporations nominally are owned on paper by psychologists, they actually are secretly owned and controlled by the laypeople;

(iii)    the professional corporations serve as vehicles through which fraudulent no-fault claims for reimbursement are submitted to Allstate for psychological services allegedly provided to individuals involved in New York automobile accidents ("Insureds"); and

(iv)    the laypeople who secretly and unlawfully own the psychology professional corporations use their total control over the professional corporations – including their bank accounts – to siphon all of the professional corporations' profits to themselves.

2.    Accordingly, in addition to seeking more than one million ($1,000,000.00) dollars that the Defendants have stolen from Allstate, and at least two hundred fifty thousand ($250,000.00) dollars in arbitration fees that the Defendants have caused Allstate to needlessly incur, Allstate seeks a declaration that it is not legally obligated to pay reimbursement of more

than four hundred thousand ($400,000.00) dollars in fraudulent claims submitted by or through the Defendants because:

    (i)    the Defendant professional corporations have no right to receive payment for any pending bills submitted to Allstate because these professional corporations are fraudulently incorporated, owned and/or controlled by non-psychologists and, therefore, are ineligible to seek or recover no-fault benefits;

    (ii)    the Defendant professional corporations have no right to receive payment for any pending bills submitted to Allstate because the professional corporations engage in unlawful fee-splitting with non-psychologists; and

    (iii)    the psychology services that were billed to Allstate through the Defendant professional corporations were not medically or psychologically necessary, and were performed – to the extent that they were performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants.

3.    The Defendants fall into the following categories:

    (i)    Defendants HK Psychological, P.C. ("HK"), Kingshwy Psychological, P.C. ("Kings"), Omega Psychological, P.C. ("Omega"), and Jay Psychological, P.C. ("JayPsych") (collectively the "PC Defendants") are fraudulently incorporated New York psychology professional corporations, through which the psychology services purportedly were performed and billed to insurance companies, including Allstate.

    (ii)    Defendant Jay Alfred Seitz, Ph.D. ("Dr. Seitz") is a psychologist licensed to practice psychology in the State of New York who falsely purports to own Omega and JayPsych. In addition, non-party Howard A. Kaplan, Ph.D. ("Dr. Kaplan") is a psychologist licensed to practice psychology in the State of New York. Dr. Kaplan's identity was stolen and was used to fraudulently incorporate HK and Kings.

    (iii)    Defendants Ben L. Adler ("Adler"), Aleksandr Gormakh ("Gormakh"), Milana Gormakh ("M. Gormakh"), Peter Kerner ("Kerner"), and Shori Matatov ("Matatov") (collectively the "Management Defendants") are the unlicensed, non-psychologists that actually own and control the PC Defendants in violation of New York law, and – upon information and belief – actually stole Dr. Kaplan's identity to fraudulently incorporate HK and Kings.

4.     As discussed below, Defendants at all relevant times have known that: (i) the PC Defendants are owned and controlled by non-psychologists, not Dr. Seitz, Dr. Kaplan, or other licensed psychologists; and (ii) the psychological services that were billed to Allstate through the PC Defendants were ordered and performed – to the extent that they were performed at all – pursuant to fraudulent, pre-determined protocols solely designed to maximize charges to Allstate and other insurers, not because they were medically or psychologically necessary or designed to facilitate the treatment of or otherwise benefit the Insureds who were subjected to them.

5.     In addition, the financial and operational relationships between the Defendants deliberately have been created to allow the Management Defendants to secretly own and control the PC Defendants, and to illegally split fees by funneling the insurance proceeds paid by insurers (including Allstate) to non-psychologists.  The PC Defendants do not now have, and never had, any right to be compensated for the bills they have submitted to Allstate and to other New York automobile insurers.

6.     The charts annexed hereto as Exhibits "1" through "4" illustrate the fraudulent claims identified to-date that the Defendants have submitted, or caused to be submitted, to Allstate. The Defendants' interrelated fraudulent schemes began as early as 2005 and have continued uninterrupted since that time. As a result of the Defendants' interrelated schemes, Allstate has incurred damages of more than one million two hundred fifty thousand ($1,250,000.00) dollars since 2005.

## THE PARTIES

**I.    Plaintiff**

7.    Plaintiff Allstate Insurance Company is an Illinois corporation with its principal place of business in Northbrook, Illinois.  Allstate is authorized to conduct business and to issue automobile insurance policies in the State of New York.

**II.    Defendants**

**A.    Dr. Seitz**

8.    Defendant Dr. Seitz is a psychologist who has been licensed to practice psychology in New York since June 14, 1991, and serves as the nominal or "paper" owner of Defendants Omega and JayPsych.  Dr. Seitz resides in and is a citizen of New York.

**B.    The PC Defendants**

9.    Defendant HK is a New York psychology professional service corporation with its principal place of business in New York. HK was fraudulently incorporated in New York on or about January 3, 2005, after the Management Defendants stole Dr. Kaplan's identity for that purpose, and is owned on paper by Dr. Kaplan, but in actuality is owned and controlled by unlicensed non-psychologists in contravention of New York law.

10.    Defendant Kings is a New York psychology professional service corporation with its principal place of business in New York.  Kings was fraudulently incorporated in New York on or about January 24, 2008 after the Management Defendants stole Dr. Kaplan's identity for that purpose, and is owned on paper by Dr. Kaplan, but in actuality is owned and controlled by unlicensed non-psychologists in contravention of New York law.

11.    Defendant JayPsych is a New York psychology professional service corporation with its principal place of business in New York.  JayPsych was fraudulently incorporated in

New York on or about September 8, 2006, is owned on paper by Dr. Seitz, but in actuality is owned and controlled by unlicensed non-psychologists in contravention of New York law.

12.     Defendant Omega is a New York psychology professional service corporation with its principal place of business in New York. Omega was fraudulently incorporated in New York on or about June 17, 2008, is owned on paper by Dr. Seitz, but in actuality is owned and controlled by unlicensed non-psychologists in contravention of New York law.

### C.     The Management Defendants

13.     Defendant Adler resides in and is a citizen of the State of New York. Adler never has been a licensed psychologist or mental health professional, yet secretly owns, controls, and derives economic benefit from the operation of the PC Defendants in contravention of New York law.

14.     Defendant Gormakh resides in and is a citizen of the State of New York. Gormakh never has been a licensed psychologist or mental health professional, yet secretly owns, controls, and derives economic benefit from the operation of the PC Defendants in contravention of New York law. On October 29, 2009, Gormakh entered into a plea agreement in the United States District Court for the Southern District of New York whereby he pleaded guilty to – among other things – conspiracy to commit health care fraud, mail fraud, money laundering, and witness tampering. In particular, Gormakh pleaded guilty to creating and submitting fraudulent insurance claims for psychological services between 2004 and 2009.

15.     Defendant M. Gormakh resides in and is a citizen of the State of New York. M. Gormakh never has been a licensed psychologist or mental health professional, yet secretly owns, controls, and derives economic benefit from the operation of the PC Defendants in contravention of New York law. On October 29, 2009, M. Gormakh entered into a plea agreement in the United

6

States District Court for the Southern District of New York whereby she pleaded guilty to – among other things – conspiracy to commit health care fraud, mail fraud, money laundering, and witness tampering. In particular, M. Gormakh pleaded guilty to creating and submitting fraudulent insurance claims for psychological services between 2004 and 2009.

16.    Defendant Kerner resides in and is a citizen of the State of New York. Kerner never has been a licensed psychologist or mental health professional, yet secretly owns, controls, and derives economic benefit from the operation of the PC Defendants in contravention of New York law. On August 26, 2009, Kerner entered into a plea agreement in the United States District Court for the Southern District of New York whereby he pleaded guilty to – among other things – conspiracy to commit health care fraud, mail fraud, and witness tampering. In particular, Kerner pleaded guilty to creating and submitting fraudulent insurance claims for psychological services between 2004 and 2009.

17.    Defendant Matatov resides in and is a citizen of the State of New York. Matatov never has been a licensed psychologist or mental health professional, yet secretly owns, controls, and derives economic benefit from the operation of the PC Defendants in contravention of New York law. On October 22, 2009, Matatov entered into a plea agreement in the United States District Court for the Southern District of New York whereby he pleaded guilty to conspiracy to commit health care fraud in connection with, among other things, the creation and submission of fraudulent insurance claims for psychological services between 2004 and 2009.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. §

7

1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.     An Overview of the No-Fault Laws and Licensing Statutes**

20.     Allstate underwrites automobile insurance in the State of New York.

21.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

22.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including psychological services.

23.     An Insured can assign his/her right to No-Fault Benefits to health care service providers in exchange for those services.  Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of

Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

24.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or collect No-Fault Benefits if they were unlawfully incorporated. In New York, only a licensed psychologist may: (i) practice psychology; (ii) own and control a professional service corporation authorized to practice psychology; (iii) employ and supervise other psychologists; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services. Unlicensed individuals may not: (i) practice psychology; (ii) own or control a professional service corporation authorized to practice psychology; (iii) employ or supervise psychologists; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

25.     Pursuant to the No-Fault Laws, psychological health care service providers are not eligible to receive No-Fault Benefits if they engage in fee-splitting with unlicensed individuals or entities, which is prohibited by, inter alia, New York's Education Law.

26.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

27.     Pursuant to New York State Insurance Law § 403, the NF-3s submitted by a health care provider to Allstate, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.   The No-Fault Arbitration System

28.     Section 5106 of the Insurance Law provides that Insureds and their assignees (i.e., healthcare providers) may file lawsuits or commence arbitrations to challenge an insurer's improper or untimely denial of a No-Fault claim.  Pursuant to that authority, the Superintendent of Insurance (the "Superintendent") has mandated that the no-fault endorsement on every automobile insurance policy contain the following language:

Arbitration.    In the event any person making a claim for first-party benefits and the Company do not agree regarding any matter relating to the claim, such person shall have the option of submitting such disagreement to arbitration pursuant to procedures promulgated or approved by the Superintendent of Insurance.

29.     Pursuant to the procedures promulgated by the Superintendent of Insurance (the "Superintendent"), a healthcare provider may commence the arbitration process through the submission of a denial of claim form received from an insurer, together with a prescribed form (known as the "AR-1") setting forth the reasons why the healthcare provider is contesting the denial and a listing of the amounts in dispute.  See 11 N.Y.C.R.R. § 65-4.2(b)(1).  The matter then is assigned to a "conciliator" who is responsible for making attempts to resolve the dispute as an intermediary between the healthcare provider and the insurer.  If the dispute between the healthcare provider and the insurer cannot be resolved within 60 days from the initiation of the conciliation process, the conciliator then transfers the matter to arbitration in order to have the dispute resolved by an arbitrator assigned by the designated organization.  See 11 N.Y.C.R.R. §§ 65-4.2(b)(2)(iv), 65-4.5(a) and 65-4.5(f).

30.     Pursuant to 11 N.Y.C.R.R. § 65-4.2(a)(2), the Superintendent has designated the American Arbitration Association (the "AAA") as the body that is responsible for administration of the No-Fault arbitration process.  Pursuant to the Superintendent's designation, the AAA is authorized on behalf of the Superintendent to receive, attempt to conciliate, and forward to arbitration all requests for arbitration that it cannot conciliate. In order to accomplish its function, the AAA is empowered to employ individuals to manage the arbitration process, to employ individuals to attempt to conciliate the disputes in the initial stage of the proceedings, and to employ licensed attorneys as arbitrators to ultimately hear and determine the disputes that are not resolved at conciliation.

31.     With the exception of a nominal filing fee paid by the applicant, all of the costs associated with the conciliation and arbitration process before the AAA are borne by the insurers in relation to the number of matters that are filed against them by applicants in a given year.  For example, 11 N.Y.C.R.R. § 65-4.2(c)(1) states as follows:

> The cost of administering the conciliation function, reduced by any fees collected, shall be paid annually by insurers (including self-insurers and MVAIC) to the designated organization upon receipt of a statement therefrom.  This cost shall be distributed among insurers in an equitable manner approved by the Superintendent of Insurance. This distribution shall, to the extent practicable, be a function of the degree to which an insurer is named as a respondent in conciliation proceedings of the designated organization.

32.     Under this regulatory scheme, Allstate is required to pay the AAA a mandatory non-refundable fee in every individual case where it is named as a Respondent by a healthcare provider seeking payment on a claim for No-Fault benefits that Allstate has denied.  Thus, when a healthcare provider files an AR-1 demand for arbitration with the AAA, this automatically triggers a series of fees that are assessed against Allstate with respect to that case regardless of

the size of the claim, whether the case is meritorious, or whether the applicant ultimately withdraws the claim at any stage during the process.

33.     The level of mandatory nonrefundable fees assessed against Allstate increases exponentially as each matter proceeds from conciliation through to arbitration. The mandatory fees that were assessed against Allstate for each matter submitted by a healthcare provider to AAA from 2008 through the present have been more than seven hundred ($700.00) dollars for each arbitration that is commenced.

34.     The process is driven solely by the healthcare providers because they are not required to accept offers of settlement at the conciliation stage of the proceedings or to withdraw non-meritorious claims. In fact, healthcare providers routinely withdraw claims without prejudice after matters are moved to arbitration, but prior to or at the actual hearings, to avoid adverse determinations. Because of the manner in which the arbitration process operates, the healthcare providers routinely seek to leverage the costs associated with the proceedings that are incurred by the insurers as a means to collect benefits to which they are not entitled.

## III.     The Fraudulent Incorporation and Operation of the PC Defendants

35.     Beginning in 2005, and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which the PC Defendants – four psychology professional service corporations nominally owned on paper by Dr. Kaplan or Dr. Seitz, but actually illegally owned and controlled by non-psychologists – have been used to bill the New York automobile insurance industry millions of dollars that they never were eligible to receive.

A.     **The Fraudulent Incorporation and Operation of HK**

36.     To accomplish this scheme, the Management Defendants first fraudulently incorporated HK in order to establish a vehicle through which fraudulent billing for psychology services could be submitted to Allstate and other insurers.

37.     To implement their scheme, in or about late 2004, the Management Defendants stole Dr. Kaplan's identity so that they could fraudulently incorporate HK and use it to submit large-scale fraudulent billing to insurers.

38.     In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing HK to practice psychology, the Management Defendants entered into a secret scheme with one another. After stealing Dr. Kaplan's identity, the Management Defendants filed a certificate of incorporation with the Department of Education, and filed biennial statements thereafter, which falsely represented that Dr. Kaplan is the true shareholder, director and officer of HK and that he truly owns, controls and practices through the professional corporation.

39.     Dr. Kaplan has disclaimed any knowledge of HK's existence until recently, and has stated that it was incorporated and operated through the theft of his identity.

40.     The Management Defendants, rather than Dr. Kaplan, provided all start-up costs and investment in HK. Dr. Kaplan did not incur any costs to establish HK's practice, nor did he invest any money in the professional corporation he purportedly owns, and until recently was unaware of its existence.

41.     Since the Management Defendants stole Dr. Kaplan's identity to fraudulently incorporate HK, true ownership and control over HK has rested at all times entirely with the Management Defendants, who have used the façade of HK to do indirectly what they are

13

forbidden from doing directly, namely to: (i) employ psychologists and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

42.     All decision-making authority relating to the operation and management of HK has been vested entirely with the Management Defendants. In addition, Dr. Kaplan has never controlled or maintained any of HK's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities that were responsible for handling any aspect of HK's financial affairs; never hired or supervised any of HK's employees or independent contractors, and until recently was completely unaware of HK's existence.

43.     Upon information and belief, to conceal their true ownership and control of HK while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have HK enter into a series of "management," "marketing," "lease," and "billing" agreements with themselves and with entities that they own and control. These agreements called for exorbitant payments from HK to either the Management Defendants or to entities that they own and control, in amounts far exceeding HK's actual revenues, for facility lease, equipment lease, and/or the alleged performance of certain designated services including management, marketing, billing, and collections regardless of: (i) the volume of HK's business; (ii) the income generated by the professional corporation; and (iii) the actual value of the leasehold interests and services that were provided.

44.     While these agreements ostensibly were created to permit the Management Defendants to provide leaseholds, "management," "marketing," and "billing" services, they actually have been used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own HK; and (ii) to

14

siphon all of the revenues that were generated by the billings submitted to Allstate and other insurers through HK.

45.     Upon information and belief, the net effect of these agreements between HK, the Management Defendants and their entities has been to maintain HK in a constant state of debt to the Management Defendants, thereby enabling them to maintain total control over the professional corporation, its account receivables, and any revenues that might be generated therefrom.

46.     To facilitate their ability to siphon all of HK's revenues to themselves, the Management Defendants have caused HK to direct all insurers to submit payment on HK's billing to a post office box in Brooklyn, New York that is under their exclusive control.

47.     The Management Defendants have operated HK by forging Dr. Kaplan's signature, which they have used to prepare corporate paperwork and billing that they have submitted to insurers, including Allstate, through HK.

### B.      The Fraudulent Incorporation and Operation of JayPsych

48.     After fraudulently incorporating HK and illegally operating the professional corporation for approximately a year and a half, the Management Defendants grew dissatisfied with the volume of fraudulent psychology billing that they were able to submit through a single professional corporation. Accordingly, they decided to fraudulently incorporate a second professional corporation in order to double their ill-gotten gains.

49.     Toward that end, in about mid-2006, the Management Defendants recruited a licensed psychologist – Dr. Seitz – who was willing to "sell" his psychology license to the Management Defendants so that they could fraudulently incorporate JayPsych and use it to submit still more large-scale fraudulent billing to insurers.

50.     In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing JayPsych to practice psychology, the Management Defendants entered into a secret scheme with Dr. Seitz. In exchange for a designated salary or other form of compensation, in September 2006, Dr. Seitz agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he is the true shareholder, director and officer of JayPsych and that he truly owns, controls and practices through the professional corporation.

51.     Once JayPsych was fraudulently incorporated, Dr. Seitz ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

52.     The Management Defendants, rather than Dr. Seitz, provided all start-up costs and investment in JayPsych. Dr. Seitz did not incur any costs to establish JayPsych's practice, nor did he invest any money in the professional corporation he purportedly owns.

53.     As with Dr. Kaplan and HK, Dr. Seitz never has been the true shareholder, director, or officer of JayPsych, and never has had any true ownership interest in or control over the professional corporation. True ownership and control over JayPsych has rested at all times entirely with the Management Defendants, who have used the façade of JayPsych to do indirectly what they are forbidden from doing directly, namely to: (i) employ psychologists and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

54.     Throughout the course of Dr. Seitz's relationship with the Management Defendants, all decision-making authority relating to the operation and management of JayPsych has been vested entirely with the Management Defendants. In addition, Dr. Seitz has never controlled or maintained any of JayPsych's books or records, including its bank accounts; never

selected, directed, and/or controlled any of the individuals or entities that were responsible for handling any aspect of JayPsych's financial affairs; never hired or supervised any of JayPsych's employees or independent contractors, and has been completely unaware of the most fundamental aspects of how JayPsych has operated. In reality, Dr. Seitz never has been anything more than a de facto employee of the Management Defendants.

55.    Upon information and belief, to conceal their true ownership and control of JayPsych while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Dr. Seitz and JayPsych enter into a series of "management," "marketing," "lease," and "billing" agreements with themselves and with entities that they own and control. These agreements called for exorbitant payments from JayPsych to either the Management Defendants or to entities that they own and control, in amounts far exceeding JayPsych's actual revenues, for facility lease, equipment lease, and/or the alleged performance of certain designated services including management, marketing, billing, and collections regardless of: (i) the volume of JayPsych's business; (ii) the income generated by the professional corporation; and (iii) the actual value of the leasehold interests and services that were provided.

56.    As was the case with HK, while these agreements ostensibly were created to permit the Management Defendants to provide leaseholds, "management," "marketing," and "billing" services, they actually have been used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own JayPsych; and (ii) to siphon all of the revenues that were generated by the billings submitted to Allstate and other insurers through JayPsych.

57.     Upon information and belief, the net effect of these agreements between Dr. Seitz, JayPsych, the Management Defendants and their entities has been to maintain JayPsych in a constant state of debt to the Management Defendants, thereby enabling them to maintain total control over the professional corporation, its account receivables, and any revenues that might be generated therefrom.

58.     To facilitate their ability to siphon all of JayPsych's revenues to themselves, the Management Defendants have caused JayPsych to direct all insurers to submit payment on JayPsych's billing to a post office box in Brooklyn, New York that is under their exclusive control.

**C.     The Fraudulent Incorporation and Operation of Kings**

59.     In late 2007, the Management Defendants decided to fraudulently incorporate another psychology professional corporation, because they were concerned that the volume of fraudulent billing they were submitting through HK and JayPsych would draw attention to their scheme.

60.     The Management Defendants hoped to reduce the volume of this billing by submitting part of it through a third professional corporation.

61.     Accordingly, the Management Defendants decided to once again steal Dr. Kaplan's identity to create a new professional corporation under a new tax identification number in order to reduce the volume of billing submitted HK and JayPsych, avoid detection, and thereby perpetuate their scheme.

62.     Then, the Management Defendants once again stole Dr. Kaplan's identity to fraudulently incorporate Kings, a professional corporation.

18

63.     As at HK, in order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Kings to practice psychology, the Management Defendants entered into a secret scheme with one another. After stealing Dr. Kaplan's identity, the Management Defendants filed a certificate of incorporation with the Department of Education, and filed biennial statements thereafter, which falsely represented that Dr. Kaplan is the true shareholder, director and officer of Kings and that he truly owns, controls and practices through the professional corporation.

64.     As with HK, Dr. Kaplan has disclaimed any knowledge of Kings' existence until recently, and has stated that it was incorporated and operated through the theft of his identity.

65.     The Management Defendants, rather than Dr. Kaplan, provided all start-up costs and investment in Kings. Dr. Kaplan did not incur any costs to establish Kings' practice, nor did he invest any money in the professional corporation he purportedly owns, and until recently was unaware of its existence.

66.     Since the Management Defendants stole Dr. Kaplan's identity to fraudulently incorporate Kings, true ownership and control over Kings has rested at all times entirely with the Management Defendants, who have used the façade of Kings to do indirectly what they were forbidden from doing directly, namely to: (i) employ psychologists and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

67.     All decision-making authority relating to the operation and management of Kings has been vested entirely with the Management Defendants. In addition, Dr. Kaplan has never controlled or maintained any of Kings' books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities that were responsible for

handling any aspect of Kings' financial affairs; never hired or supervised any of Kings' employees or independent contractors, and until recently was completely unaware of Kings' existence.

68.     Upon information and belief, to conceal their true ownership and control of Kings while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Kings enter into a series of "management," "marketing," "lease," and "billing" agreements with themselves and with entities that they own and control. These agreements called for exorbitant payments from Kings to either the Management Defendants or to entities that they own and control, in amounts far exceeding Kings' actual revenues, for facility lease, equipment lease, and/or the alleged performance of certain designated services including management, marketing, billing, and collections regardless of: (i) the volume of Kings' business; (ii) the income generated by the professional corporation; and (iii) the actual value of the leasehold interests and services that were provided.

69.     While these agreements ostensibly were created to permit the Management Defendants to provide leaseholds, "management," "marketing," and "billing" services, they actually have been used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own Kings; and (ii) to siphon all of the revenues that were generated by the billings submitted to Allstate and other insurers through Kings.

70.     Upon information and belief, the net effect of these agreements between Kings, the Management Defendants and their entities has been to maintain Kings in a constant state of debt to the Management Defendants, thereby enabling them to maintain total control over the

professional corporation, its account receivables, and any revenues that might be generated therefrom.

71.    To facilitate their ability to siphon all of Kings' revenues to themselves, the Management Defendants have caused Kings to direct all insurers to submit payment on Kings' billing to a post office box in Brooklyn, New York that is under their exclusive control.

72.    The Management Defendants have operated Kings by forging Dr. Kaplan's signature, which they have used to prepare corporate paperwork and billing that they submitted to insurers, including Allstate, through Kings.

**D.    The Fraudulent Incorporation and Operation of Omega**

73.    In mid-2008, the Management Defendants decided to fraudulently incorporate still another psychology professional corporation, because they were concerned that the volume of fraudulent billing they were submitting through HK, JayPsych, and Kings would draw attention to their scheme.

74.    The Management Defendants hoped to reduce the volume of this billing by submitting part of it through a fourth professional corporation.

75.    Accordingly, the Management Defendants decided to create a new professional corporation under a new tax identification number in order to reduce the volume of billing submitted through HK, JayPsych, and Kings, avoid detection, and thereby perpetuate their scheme.

76.    Toward that end, in mid-2008, the Management Defendants approached Dr. Seitz and offered him the opportunity to serve as the nominal or "paper" owner of Omega, the new professional corporation that they intended to fraudulently incorporate.

77.     As was the case at JayPsych, Dr. Seitz agreed to sell his psychology license to the Management Defendants so that they could fraudulently incorporate Omega and use it to submit large-scale fraudulent billing to insurers, including Allstate.

78.     As at JayPsych, in order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Omega to practice psychology, the Management Defendants entered into a secret scheme with Dr. Seitz. In exchange for a designated salary or other form of compensation, in June 2008, Dr. Seitz agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he is the true shareholder, director and officer of Omega and that he truly owns, controls and practices through the professional corporation.

79.     Once Omega was fraudulently incorporated, Dr. Seitz ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

80.     The Management Defendants, rather than Dr. Seitz, provided all start-up costs and investment in Omega. Dr. Seitz did not incur any costs to establish Omega's practice, nor did he invest any money in the professional corporation he purportedly owns.

81.     Dr. Seitz has never been the true shareholder, director, or officer of Omega, and has never had any true ownership interest in or control over the professional corporation. True ownership and control over Omega has rested at all times entirely with the Management Defendants, who have used the façade of Omega to do indirectly what they were forbidden from doing directly, namely to: (i) employ psychologists and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

82.    Throughout the course of Dr. Seitz's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Omega has been vested entirely with the Management Defendants. In addition, Dr. Seitz has never controlled or maintained any of Omega's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities that were responsible for handling any aspect of Omega's financial affairs; never hired or supervised any of Omega's employees or independent contractors, and has been completely unaware of the most fundamental aspects of how Omega has operated. In reality, and as was the case during his tenure as nominal owner of JayPsych, Dr. Seitz never has been anything more than a de facto employee of the Management Defendants.

83.    Upon information and belief, to conceal their true ownership and control of Omega while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Dr. Seitz and Omega enter into a series of "management," "marketing," "lease," and "billing" agreements with themselves and with entities that they own and control. These agreements called for exorbitant payments from Omega to either the Management Defendants or to entities that they own and control, in amounts far exceeding Omega's actual revenues, for facility lease, equipment lease, and/or the alleged performance of certain designated services including management, marketing, billing, and collections regardless of: (i) the volume of Omega's business; (ii) the income generated by the professional corporation; and (iii) the actual value of the leasehold interests and services that were provided.

84.    While these agreements ostensibly were created to permit the Management Defendants to provide leaseholds, "management," "marketing," and "billing" services, they

actually have been used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own Omega; and (ii) to siphon all of the revenues that were generated by the billings submitted to Allstate and other insurers through Omega.

85.     Upon information and belief, the net effect of these agreements between Dr. Seitz, Omega, the Management Defendants and their entities has been to maintain Omega in a constant state of debt to the Management Defendants, thereby enabling them to maintain total control over the professional corporation, its account receivables, and any revenues that might be generated therefrom.

86.     To facilitate their ability to siphon all of Omega's revenues to themselves, the Management Defendants have caused Omega to direct all insurers to submit payment on Omega's billing to a post office box in Brooklyn, New York that is under their exclusive control.

87.     The ownership and control of the PC Defendants by non-psychologists compromises patient care, as the provision of mental health services by the PC Defendants is subject to the pecuniary interests of non-psychologists as opposed to the exercise of independent psychological judgment by true psychologist-owners.

88.     Because the PC Defendants were fraudulently incorporated, used as conduits to illegally split fees with unlicensed non-psychologists, and have not been owned or controlled by licensed psychologists, the PC Defendants are ineligible to receive reimbursement under the No-Fault Laws for services billed to insurance companies, including Allstate.

**IV.    The Defendants' Fraudulent Treatment Protocol**

89.    The PC Defendants have no fixed places of business, do not maintain stand-alone practices, are not the owners or leaseholders in the real property from which they have operated, do not advertise for patients, and do not employ their own support staff.

90.    Rather, the PC Defendants have operated through a network of so-called "healthcare clinics" located throughout the greater New York City area (the "Clinics"). Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, these Clinics in actuality are organized to supply convenient, one-stop shops for No-Fault insurance fraud. These Clinics have provided facilities for the PC Defendants, as well as – variously – one or more medical professional service corporations, chiropractic professional service corporations, acupuncture professional service corporations, dental professional service corporations, and/or physical therapy professional service corporations.

91.    The PC Defendants gained access to these Clinics through payment of kickbacks from the Management Defendants. The kickbacks were disguised as ostensibly legitimate fees to "lease" space or personnel from the Clinics.  In fact, these were "pay-to-play" arrangements that caused the Clinics to provide access to Insureds and to steer the Insureds to the PC Defendants.

92.    In exchange for these kickbacks, when an Insured visited one of the Clinics, he or she automatically was referred to one of the PC Defendants for psychological treatments, regardless of individual symptoms, presentment or – in virtually every case – the total absence of any psychological problems arising from any automobile accident.

93.    Every Insured who was referred to one of the PC Defendants was subjected to a virtually-identical series of medically and psychologically unnecessary psychological examinations and tests that were provided pursuant to a pre-determined, fraudulent protocol.

94.     Each step in the fraudulent "treatment" protocol was billed to Allstate or other insurers, and was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step. Specifically:

**A.     The Fraudulent "Diagnostic Interview Examination" and "Record Evaluation" Charges**

95.     Upon receiving a referral to one of the PC Defendants for psychological treatments, virtually every Insured purportedly received an initial "Diagnostic Interview Examination."

96.     The Diagnostic Interview Examination then was billed to Allstate under billing code 90801, resulting in a charge of $194.58, separate and independent of the other psychological services that the Insured purportedly received.

97.     The Diagnostic Interview Examinations were fraudulent inasmuch as they were medically and psychologically unnecessary, and were conducted, to the extent that they were conducted at all, solely pursuant to the kickback arrangements between the PC Defendants and the Clinics – virtually every Insured who purportedly was subjected to the Diagnostic Interview Examinations did not have any actual psychological complaints arising from automobile accidents.

98.     In addition, the Defendants' charges for Diagnostic Interview Examinations allegedly performed at HK and Kings were fraudulent in that – in virtually every instance – they supposedly were performed by Dr. Kaplan. However, Dr. Kaplan never performed any Diagnostic Interview Examinations at HK or Kings, and – indeed – was unaware that HK or Kings even existed.

99.     Even so, virtually every Insured who purportedly was subjected to the Diagnostic Interview Examinations received a pre-determined, boilerplate "diagnosis" of "posttraumatic stress disorder," or "adjustment disorder" with or without "anxiety," "anxious mood," and/or "depressed mood," purportedly as the result of trauma incurred during an automobile accident. The Insureds received these phony "diagnoses" regardless of their individual circumstances or unique presentment. In actuality, none of the Insureds actually suffered from "posttraumatic stress disorder," "adjustment disorder," or any other legitimate psychological problems as the result of the minor automobile accidents they supposedly had experienced.

100.    According to the <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th Edition (the "DSM-IV"), which is published by the American Psychiatric Association and provides a common language and standardized criteria for the classification of mental disorders, a diagnosis of "posttraumatic stress disorder" requires – among other things – that the patient "experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others." In addition, a posttraumatic stress disorder diagnosis requires that the patient's response "involved intense fear, helplessness, or horror."

101.    According to the DSM-IV, a diagnosis of "adjustment disorder" requires – among other things – the "development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s)," and likewise requires that the patient exhibit "marked distress that is in excess of what would be expected from exposure to the stressor" or "significant impairment in social or occupational (academic) functioning."

102.    Where an "adjustment disorder" diagnosis includes the "depressed mood" subspecification, the patient must manifest symptoms such as depressed mood, tearfulness, or feelings of hopelessness.

103.    Where an "adjustment disorder" diagnosis includes the "anxiety" subspecification, the patient must manifest symptoms such as nervousness, worry, or jitteriness.

104.    In virtually every claim for No-Fault Benefits submitted by or through the Defendants, the Insured allegedly was involved in a very minor accident involving a low-speed rear-end collision or a side-swipe. Most of the Insureds did not go to the hospital at all following the alleged accidents, and the small minority of Insureds who did go to the hospital were briefly observed on an outpatient basis and sent on their way after an hour or two. These trivial "fender-benders" did not induce any form of "adjustment disorder" in the Insureds who purportedly experienced them, much less "posttraumatic stress disorder" – a condition typically associated with the abject horror of military combat, terrorist attacks, kidnapping or torture.

105.    In fact, these purported diagnoses were rendered solely to support continued charges to Allstate for unnecessary psychological services, in that – at the close of the Diagnostic Interview Examinations – virtually every Insured was told to return to the PC Defendants several times per month for several months for psychotherapy and psychological testing.

106.    Not only did the Defendants submit fraudulent billing for the Diagnostic Interview Examinations, they also "unbundled" the charges in virtually every instance in order to maximize the fraudulent billing they could submit, or cause to be submitted, to Allstate.

107.    For instance, for virtually every Insured, on the same dates that they submitted charges for the Diagnostic Interview Examinations, the Defendants submitted separate charges of $67.24 under billing code 90885. The use of billing code 90885 represents that a psychologist

conducted "psychiatric evaluation of hospital records, other psychiatric reports, psychometric and/or projective tests, and other accumulated data for medical diagnostic purposes." The Defendants submitted these charges despite the fact that review and evaluation of the Insureds' medical and psychological records was necessary to, and already was reimbursed as an element of, the Insureds' Diagnostic Interview Examinations. In other words, healthcare providers cannot conduct and bill for a Diagnostic Interview Examination, then bill separately for contemporaneously-provided medical or psychological record reviews.

108.    Furthermore, the Defendants' charges under billing code 90885 for record review and evaluation were fraudulent inasmuch as no psychologists associated with the PC Defendants ever reviewed or evaluated any records to support the charges.

**B.      The Fraudulent Initial "Psychotherapy" Charges**

109.    Based upon the fraudulent, pre-determined outcome of the Diagnostic Interview Examinations, virtually every Insured purportedly was told to return for multiple, unnecessary psychotherapy sessions.

110.    The initial psychotherapy sessions for each Insured typically were conducted, to the extent that they were conducted at all, on the same day as the Diagnostic Interview Examinations and medical/psychological record reviews and evaluations. These supposed initial psychotherapy sessions were billed to Allstate under billing code 90804, resulting in a charge of $76.88 per Insured.

111.    The charges for these initial psychotherapy sessions were fraudulent inasmuch as they were duplicative of the charges that the Defendants submitted, or caused to be submitted, on the same dates for the Diagnostic Interview Examinations. In fact, neither Dr. Seitz, nor any other psychologists associated with the PC Defendants, ever conducted the initial psychotherapy

sessions that were billed to Allstate. Rather, the Defendants simply billed Allstate twice for the first encounter between a psychologist and each Insured: Once under billing code 90801, labeling the meeting as a "Diagnostic Interview Examination," and a second time under billing code 90804, labeling the meeting as "psychotherapy."

112.    The charges for these initial psychotherapy sessions also were fraudulent because – according to the New York Workers' Compensation Fee Schedule, which is applicable to claims for No-Fault Benefits (the "Fee Schedule") – the use of billing code 90804 requires that the psychologist spend between 20-30 minutes face-to-face with the Insured. The Defendants' use of billing code 90804 with respect to the initial psychotherapy sessions materially misrepresented and exaggerated the level of services that were provided, in that neither Dr. Seitz, nor any other psychologists associated with the PC Defendants, spent any time conducting the initial psychotherapy sessions with the Insureds. Rather, the Defendants simply relabeled the Diagnostic Interview Examinations as psychotherapy, then billed for them twice.

113.    In addition, the charges for these initial psychotherapy sessions were fraudulent because they were medically and psychologically unnecessary. Though the charges supposedly were justified by the boilerplate, pre-determined "diagnosis" of "adjustment disorder" or "posttraumatic stress disorder," the Insureds did not suffer from "adjustment disorder," "posttraumatic stress disorder," or any other legitimate psychological problems as the result of the minor, low-speed, low impact fender benders they supposedly had experienced.

114.    Furthermore, the charges for these initial psychotherapy sessions were fraudulent in that the outcomes were pre-determined, not tailored to any Insured's unique circumstances. Specifically, at the conclusion of each Insured's first encounter with a psychologist, whether labeled as a Diagnostic Interview Examination, psychotherapy, or – in virtually every instance –

both, the Insured was told to return to the PC Defendants several times per month for several months for further psychotherapy sessions and psychological testing.

115.    In addition, the Defendants' charges for initial psychotherapy sessions allegedly performed at HK and Kings were fraudulent in that – in virtually every instance – they supposedly were performed by Dr. Kaplan. However, Dr. Kaplan never performed any initial psychotherapy sessions at HK or Kings, and – indeed – was unaware that HK or Kings even existed.

### C.    The Fraudulent Follow-Up "Psychotherapy" Charges

116.    Based upon the fraudulent, pre-determined outcome of the Diagnostic Interview Examinations/initial psychotherapy sessions, and the phony "adjustment disorder with anxiety/depression" diagnoses, the Defendants purportedly provided virtually every Insured with at least five and as many as 15 follow-up psychotherapy sessions, typically over the course of several months.

117.    These follow-up psychotherapy sessions were billed to Allstate under billing code 90806, resulting in a charge of $120.10 per Insured, per session.

118.    The charges for these follow-up psychotherapy sessions were fraudulent because – according to the Fee Schedule – the use of billing code 90806 requires that the psychologist spend between 45-50 minutes face-to-face with the Insured. The Defendants' use of billing code 90806 with respect to the follow-up psychotherapy sessions materially misrepresented and exaggerated the level of services that were provided, in that neither Dr. Seitz, nor any other psychologists associated with the PC Defendants, spent 45-50 minutes with the Insureds. Rather, the follow-up psychotherapy sessions virtually never lasted more than 20 minutes, to the extent that they were conducted at all.

119.    Moreover, the Defendants' charges for follow-up psychotherapy sessions allegedly performed at HK and Kings were fraudulent in that – in virtually every instance – they supposedly were performed by Dr. Kaplan. However, Dr. Kaplan never performed any follow-up psychotherapy sessions at HK or Kings, and – indeed – was unaware that HK or Kings even existed.

120.    Furthermore, the Defendants also submitted billing, or caused it to be submitted, for follow-up psychotherapy sessions at JayPsych and Omega that never occurred. In order to make it appear as if the follow-up psychotherapy sessions actually occurred, the Defendants fabricated phony psychological treatment progress notes by copying text from pre-existing treatment progress notes and pasting it into new treatment progress notes that they created for new Insureds. Then, the Defendants billed Allstate for bogus follow-up psychotherapy sessions, and used the phony treatment progress notes to support their billing.

121.    For example, in support of their phony billing for follow-up psychotherapy sessions:

(i)     The Defendants created and submitted treatment progress notes for at least 17 different Insureds who purportedly received treatment at HK, Kings, JayPsych, and Omega between June 2006 and May 2008. Each of the 17 sets of treatment progress notes contained the following, identical phrase: "In spite of ours mutual efforts to reduce the patient's frequency and level of manifestation of his [or her] accident related symptoms of depression, anxiety, and irritability, he [or she] is still having them clearly manifested." Copies of these duplicated treatment notes, with identical grammatical errors, are annexed hereto as Exhibit "5."

(ii)    The Defendants created and submitted treatment progress notes for at least 22 different Insureds who purportedly received treatment at HK, Kings, JayPsych, and Omega between June 2006 and September 2008. Each of the 22 sets of treatment progress notes contained the following, identical phrase: "Patient complained of insomnia due to nightmares regarding the accident, fatigue during the day." Copies of these duplicated treatment notes are annexed hereto as Exhibit "6."

(iii)    The Defendants created and submitted treatment progress notes for at least 21 different Insureds who purportedly received treatment at HK, Kings, JayPsych, and Omega between May 2006 and October 2008. Each of the 21 sets of treatment progress notes contained the following, identical phrase: "The patient reported feeling better for the last couple of days, except his memory and concentration abilities, that is still deteriorated in comparison with his [or her] regular level of functioning." Copies of these duplicated treatment notes, with identical grammatical errors, are annexed hereto as Exhibit "7."

(iv)    The Defendants created and submitted treatment progress notes for at least 25 different Insureds who purportedly received treatment at HK, Kings, JayPsych, and Omega between May 2006 and November 2008. Each of the 25 sets of treatment progress notes contained the following, identical phrase: "The patient came in extremely bad mood. He [or she] was sorrowful, gloomy and mirthless." Copies of these duplicated treatment notes are annexed hereto as Exhibit "8."

(v)    The Defendants created and submitted treatment progress notes for at least seven different Insureds who purportedly received treatment at HK, JayPsych, and Omega between June 2006 and November 2008. Each of the seven sets of treatment progress notes contained the following, identical phrase: "The patient still concerned about her [or his] interaction model, which seems to be dysfunctional to her and is still affected by the consequences of the motor vehicle collision she [or he] was involved in." In addition, this phrase appears in at least two sets of treatment progress notes that purport to reflect follow-up psychotherapy sessions conducted on two different Insureds on the exact same date at Omega. Copies of these duplicated treatment notes, with identical grammatical errors, are annexed hereto as Exhibit "9."

(vi)    The Defendants created and submitted treatment progress notes for at least 14 different Insureds who purportedly received treatment at HK, Kings, JayPsych, and Omega between October 2006 and August 2008. Each of the 14 sets of treatment progress notes contained the following, identical phrase: "The patient is sad and quite resistant, his [or her] depression is markedly manifested, he [or she] complains about estrangement from others and the absence of genuine interest in social events." Copies of these duplicated treatment notes are annexed hereto as Exhibit "10."

(vii)    The Defendants created and submitted treatment progress notes for 16 different Insureds who purportedly received treatment at HK, Kings, JayPsych, and Omega between January 2006 and November 2008. Each of the 16 sets of treatment progress notes contained the following, identical phrase: "The patient reported feeling better for the last several days, excluding her [or his] memory and concentration abilities that are still depreciate in association with her [or his] ordinary attitude." In addition, this phrase appears in at least two sets of treatment progress notes that purport to reflect follow-up psychotherapy sessions conducted

on two different Insureds on the exact same date at Omega. Copies of these duplicated treatment notes, with identical grammatical errors, are annexed hereto as Exhibit "11."

(viii)   The Defendants created and submitted treatment progress notes for at least six different Insureds who purportedly received treatment at Omega and JayPsych between January 2008 and November 2008. Each of the six sets of treatment progress notes contained the following, identical phrase: "The patient's condition is, according to him, considerably better. His sleeping patterns is almost the same, compared to the period before the motor vehicle collision." Copies of these duplicated treatment notes are annexed hereto as Exhibit "12."

122.   Clearly, the Defendants draw from a "stock" of language from pre-existing treatment progress notes that they randomly assemble and combine with the Insureds' claim information to create the impression that the follow-up psychotherapy sessions actually were properly performed, when in fact they either were not performed at all, or were not meant to have any benefit for the Insureds that were subjected to them.

**D.**   **The Fraudulent "Psychological Testing" Charges**

123.   Based upon the fraudulent, pre-determined outcome of the Diagnostic Interview Examinations/initial psychotherapy sessions, and the phony "posttraumatic stress disorder" and "adjustment disorder with anxiety/depression" diagnoses, the Defendants also purport to provide psychological testing to virtually every Insured.

124.   Prior to 2006, the Defendants charged Allstate and other insurers for the psychological testing under billing code 96100, virtually always for five hours of testing at a rate of $139.30 per hour. This resulted in routine charges of $696.55 per Insured.

125.   In 2006, billing code 96100 was eliminated and replaced with – among other things – billing code 96101, covering psychological testing conducted by a psychologist, and billing code 96103, covering psychological testing administered by a computer.

126.   Since 2006, the Defendants charged Allstate and other insurers for the psychological testing under billing code 96101, virtually always for five hours of testing at a rate of $184.64 per hour. This resulted in typical charges of $923.15 per Insured.

127.   The Defendants' charges for the psychological testing were fraudulent inasmuch as the testing was performed, to the extent it was performed at all, pursuant to a pre-determined fraudulent treatment protocol and was not designed to benefit the Insureds that were subjected to it. Rather, the Defendants purported to provide an identical battery of psychological tests to virtually every Insured, without regard for their individual circumstances or presentment. Specifically, the Defendants purported to provide virtually every Insured with the following psychological tests:

     (i)     Mental Status Examination;

     (ii)    Posttraumatic Stress Diagnostic Scale;

     (iii)   Beck Depression Inventory – II;

     (iv)   Beck Anxiety Inventory;

     (v)    Beck Hopelessness Scale;

     (vi)   Post-Accident Report; and

     (vii)  Pain Patient Profile.

128.   Many Insureds also received the following, additional psychological tests:

     (i)     Sleep Impairment Index; and

     (ii)    Psychological Symptoms Checklist.

129.    These tests were nothing more than a handful of pre-printed checklists and inventories that were filled out by the Insureds or the Defendants, on which check-marks were placed next to the psychological symptoms the Insureds purportedly were experiencing. However, the Defendants already had taken a detailed symptomatology from each Insured during the Interview Examinations/initial psychotherapy sessions, and the follow-up psychotherapy sessions, which in virtually every instance preceded the testing – to the limited extent that any of these procedures actually were performed at all. Accordingly, the tests were duplicative, unnecessary, and provided – to the extent they were provided at all – solely to enrich the Defendants, not to benefit the Insureds who were subjected to them.

130.    Furthermore, the Defendants' charges for the psychological testing were fraudulent because – notwithstanding the Defendants' misrepresentations that the tests virtually always took five to six hours to perform – the tests never took more than one hour to administer, score, and interpret, to the extent that they were performed in the first instance.

131.    Moreover, the Defendants' charges for psychological testing allegedly performed at HK and Kings were fraudulent in that – in virtually every instance – the testing supposedly was performed by Dr. Kaplan. However, Dr. Kaplan never performed any psychological testing at HK or Kings, and – indeed – was unaware that HK or Kings even existed.

132.    Not only did the Defendants deliberately bill for duplicative, medically-unnecessary psychological testing that in many cases never was performed in the first instance, they also unbundled the tests in order to maximize the fraudulent charges that they could submit, or cause to be submitted, to Allstate.

133.    Specifically, when submitting their billing for the psychological testing, the Defendants virtually always submitted a separate charge of $103.31 under billing code 90887 for the "interpretation or explanation" of the results of the psychological testing to the Insureds' family or other responsible persons. However, neither Dr. Seitz nor any other individuals associated with the PC Defendants ever interpreted or explained the test results to the Insureds' family members or other responsible persons. Even if they had, the charges for such "interpretation and explanation" would have been part and parcel of the charges that the Defendants submitted for the tests under billing codes 96100 and 96101.

134.    In addition, when submitting their billing for the psychological testing, the Defendants often submitted a separate charge for preparing "psychological testing reports" based on the information that the Insureds reported in the pre-printed checklists and inventories.

135.    The Defendants attempted to disguise their charges for preparation of the "psychological testing reports" by submitting them under billing code 96103, which is the code that is used to bill for computer-administered psychological testing. In virtually every instance, the Defendants charged Allstate for one hour of computer-administered psychological testing, "including psychologist's time for report writing," at a rate of $53.46 per hour.

136.    In fact, the Defendants never conducted any computer-administered psychological testing on Insureds – in almost every instance, the only "psychological tests" administered to the Insureds were the handful of pre-printed checklists and inventories that were filled out by the Insureds.

137.    The Defendants falsely represented that the charges they submitted under billing code 96103 were for both computer-administered psychological testing and report preparation in

37

a calculated attempt to conceal the fact that the charges they submitted under billing code 96103 were <u>only</u> for report preparation.

138.    The Defendants sought to conceal the fact that the charges they submitted under billing code 96103 were <u>only</u> for report preparation because, pursuant to the Fee Schedule, the Defendants' charges for the underlying tests – which were billed to Allstate under billing codes 96100 and 96101 – included any time that any psychologists spent preparing the test reports.

139.    Accordingly, the charges that the Defendants submitted under billing code 96103 were fraudulent because they misrepresented the nature of the services that the Defendants supposedly provided – the Defendants falsely contended that they provided computer-administered psychological testing.

140.    Furthermore, the charges that the Defendants submitted under billing code 96103 for report preparation were fraudulent because they were unbundled from the Defendants' charges for the underlying tests and constituted a deliberate attempt to double-bill for report preparation.

141.    Moreover, the charges that the Defendants submitted for report preparation were fraudulent – whether unbundled and presented separately under billing code 96103, or as part and parcel of the underlying test charges presented under billing codes 96100 and 96101 – because neither Dr. Seitz nor any other psychologist spent any time whatsoever preparing test reports.

142.    Rather, the Management Defendants simply cobbled the psychological testing reports together using boilerplate language from pre-existing reports, without any input from the Dr. Seitz or any other psychologists. Then, Dr. Seitz affixed his signatures to the reports, or permitted the Management Defendants to "sign" the reports using a signature stamp he provided,

without reviewing them. With respect to HK and Kings, the Management Defendants simply used the phony signature stamp they had created for "Dr. Kaplan," after stealing his identity.

143.    Virtually every psychological testing report submitted by the Defendants in support of the PC Defendants' billing contained language that was duplicated across many other reports. Only the Insureds' respective background information and "psychological test" scores were unique to any particular patient. By contrast, in almost every case, the stated purpose of the "tests," the resulting "diagnoses," the post-testing "recommendations and goals," and the "prognoses" consisted of boilerplate language that was cut-and-pasted from one Insured's testing report into the reports of many other Insureds.

144.    For instance, large numbers of purported psychological testing reports submitted by or through the Defendants included the following, identical language:

    (i)    "Psychological evaluation and testing was scheduled after initial intake interview. Assistance was requested in order to better understand of the patient's level of distress, self and trauma difficulties, intrapsychic, interpersonal functioning, diagnosis and treatment planning. Finally, there was a question of possible organicity based on the patient's report of memory and concentration problems, persistent posttraumatic headache and postconcussion symptomatology following a motor vehicle accident." A representative example of psychological testing reports submitted by or through the Defendants containing this language is annexed hereto as Exhibit "13."

    (ii)    "According to the information presented by the patient, [he/she] was in a regular state of good health and was capable of living on an equal basis with others [his/her] age, before [he/she] was involved in an accident on [date of accident], when all [his/her] symptoms began." A representative example of psychological testing reports submitted by or through the Defendants containing this language is annexed hereto as Exhibit "14."

    (iii)    "Based on [name of Insured's] presenting signs and symptoms, the determination was made to pursue more detailed psychological assessment of the emotional, cognitive, and social sequelae of [name of Insured's] trauma. The testing will allow us to better evaluate the patient's psychological functioning at present, facilitating the identification of risks

and assisting [his/her] treatment team in prescribing the necessary treatment." A representative example of psychological testing reports submitted by or through the Defendants containing this language is annexed hereto as Exhibit "15."

(iv)   "[Name of Insured's] overall intencity of distress appears in [extreme/severe] according to several objective tests and inventories." A representative example of psychological testing reports submitted by or through the Defendants containing this language is annexed hereto as Exhibit "16." In virtually every instance where the Defendants cut-and-pasted this sentence into one of the psychological testing reports they submitted or caused to be submitted to Allstate, they included the misspelling of the word "intensity" as "intencity."

(v)   "[Name of Insured] reports very high level of anxiety that is apt to constrict his life and create difficulty meeting minimal expectations without feeling overwhelmed." A representative example of psychological testing reports submitted by or through the Defendants containing this language is annexed hereto as Exhibit "17."

(vi)   "[Name of Insured] expresses an extremely high level of hopelessness at this time. The depth of [his/her] despair about the future is cause for concern." A representative example of psychological testing reports submitted by or through the Defendants containing this language is annexed hereto as Exhibit "18."

(vii)  "[Name of Insured] reported a very high level of pain which interferes with several aspects of his daily functioning (interpersonal, recreational, and occupational) to a significant degree. The discomfort also results in increased stress, sleep deprivation, and anxiety. The level of interference due to pain is significant, and this is a source of stress for [him/her]." A representative example of psychological testing reports submitted by or through the Defendants containing this language is annexed hereto as Exhibit "19."

(viii)  "It seems clear that [name of Insured's] emotional functioning has been directly and negatively affected by the accident of [date of accident]. [His/Her] traumatic experience left [him/her] feeling shaken, insecure and unsafe, as well as tense and pessimistic about what the future may hold. [Name of Insured] reports difficulties in concentrating and making decisions, and the combination of agitation and stress apparent in the various reported test scores. This may place the patient at increased risk for continuing [stress/anxiety and adjustment problems or posttraumatic stress]." A representative example of psychological testing reports

submitted by or through the Defendants containing this language is annexed hereto as Exhibit "20."

(ix)     "It seems clear that [name of Insured's] emotional functioning has been directly and negatively affected by the accident of [date of accident].[Name of Insured] indicates in interview and testing that the car accident and subsequent personal injury precipitated downward spiral of anxious, depressive and avoidance fears. Also, [he/she] has severe doubts leading to preoccupying rumination concerning whether [he/she] will regain [his/her] sense of former self and confidence. This has affected [his/her] social life as [he/she] reports more avoidant, inhibitory behavior, feeling uncomfortable and irritable with other people." A representative example of psychological testing reports submitted by or through the Defendants containing this language is annexed hereto as Exhibit "21."

(x)      "As [name of Insured's] reported symptomatic distress levels were clearly significant and were having an impact on [his/her] day to day functioning, more comprehensive evaluation of [his/her] mental status was indicated. A variety of test instruments were utilized to assess the broad spectrum of possible reactions to a traumatic incident, and the results follow." A representative example of psychological testing reports submitted by or through the Defendants containing this language is annexed hereto as Exhibit "22."

(xi)     "Since the stress which developed as the result of the accident seems quite severe, a pharmacological intervention and a series of psychotherapeutic sessions are strongly recommended to ventilate the patient's emotions and to reduce the current level of anxiety and stress." A representative example of psychological testing reports submitted by or through the Defendants containing this language is annexed hereto as Exhibit "23."

(xii)    "Treatment of [name of Insured] requires multiple efforts which draw upon an array of services, including remedial instructions, special training, environmental manipulations and structuring, psychotropic medication under psychiatrist's guidance, psychotherapy, counseling, and social casework with the patient and [his/her] family." A representative example of psychological testing reports submitted by or through the Defendants containing this language is annexed hereto as Exhibit "24."

(xiii)   "[Name of Insured's] responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. [He/She] reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. In addition, [he/she] reports a number of other strengths that are positive indications for a relatively

smooth treatment process and reasonably good prognosis." A representative example of psychological testing reports submitted by or through the Defendants containing this language is annexed hereto as Exhibit "25."

145.    As with the phony "treatment progress notes" that the Defendants cut-and-pasted together and submitted to Allstate in support of their billing, it is clear that the Defendants draw from a "stock" of language from pre-existing psychological testing reports that they randomly assemble and combine with the Insureds' claim information to create the impression that the "psychological testing" sessions actually were properly performed. In fact, they either were not performed at all, or were not meant to have any benefit for the Insureds that were subjected to them, and were only conducted for the financial benefit of the non-psychologists who secretly own and control the PC Defendants in contravention of New York law.

## V.    The Fraudulent NF-3 Forms Submitted to Allstate

146.    To support the fraudulent psychology charges, statutorily prescribed claim forms for No-Fault Benefits (i.e. the NF-3 Form) consistently have been submitted to Allstate by and on behalf of the Defendants since 2005 seeking payment for services for which the PC Defendants are ineligible to receive payment.

147.    The NF-3 forms submitted to Allstate by and on behalf of the PC Defendants are false and misleading in the following material respects:

(i)    The NF-3 forms uniformly misrepresented to Allstate that the PC Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants were not properly licensed in that they are psychology professional corporations that were unlawfully incorporated and which, in reality, have been owned and controlled by the Management Defendants who are not psychologists and who owned and controlled the PC Defendants for their sole economic benefit, while designating Dr. Seitz or Dr. Kaplan as the "nominal" or "paper" owners.

(ii)   The NF-3 forms uniformly misrepresented to Allstate that the PC Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants were not properly licensed in that they are psychology professional corporations that engaged in unlawful fee splitting with the Management Defendants who are not psychologists.

(iii)   The NF-3 forms uniformly misrepresented to Allstate that the pertinent psychological services actually were performed, and that the pertinent psychological services were medically or psychologically necessary. In fact, the psychological services frequently were not performed at all and, to the extent that they were performed, they were not medically or psychologically necessary and were performed pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants.

## VI.   The Defendants' Wrongful Arbitration Filings and the Resulting Charges to Allstate

148.   Since 2005, the Defendants have commenced, or have caused to be commenced, more than 400 individual arbitrations against Allstate seeking payment on behalf of the PC Defendants with the knowledge that the PC Defendants are ineligible to receive no-fault reimbursement, resulting in Allstate incurring more than two hundred fifty thousand ($250,000.00) in non-reimbursable fees payable to the AAA.

149.   Notwithstanding the Defendants' actual knowledge that the PC Defendants were ineligible to bill for or to collect No-Fault Benefits, each and every AR-1 that has been filed by the Defendants against Allstate, or caused to be filed, willfully misrepresented the PC Defendants were eligible to pursue collection of benefits under the No-Fault laws. In addition, each AR-1 filed by the Defendants willfully misrepresented, under oath, that the filing was made in good faith.

150.   To this date, the Defendants continue to file arbitrations on behalf of the PC Defendants, or cause them to be filed, with impunity.

**VII.    The Defendants' Fraudulent Concealment and Allstate's Justifiable Reliance**

151.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the billing that they submit, or caused to be submitted, to Allstate.

152.    To induce Allstate to promptly pay the fraudulent charges for the fraudulent psychological services, the Defendants systemically have concealed their fraud and have gone to great lengths to accomplish this concealment.

153.    Specifically, they knowingly have misrepresented and concealed facts related to the PC Defendants in an effort to prevent discovery that the professional corporations are unlawfully incorporated, owned and controlled by non-psychologists and engage in fee splitting, and therefore are ineligible to bill for or collect No-Fault Benefits. For example, the Defendants misrepresented Dr. Kaplan and Dr. Seitz's ownership of and control over the PC Defendants in filings with the New York State Department of Education, so as to induce the New York State Department of Education to issue the licenses required to permit psychology to be practiced through the PC Defendants. Additionally, the Management Defendants entered into complex financial arrangements with the PC Defendants that were designed to, and did, conceal their true ownership of and control over the PC Defendants.

154.    Likewise, in every bill that the Defendants submitted or caused to be submitted, the Defendants uniformly misrepresented that the PC Defendants properly were incorporated, lawfully licensed, and eligible to bill for and collect No-Fault Benefits, when in fact they were not.

155.    Moreover, the Defendants have created fraudulent verifications or caused them to be created – with respect to both collections Complaints and discovery responses – and have filed and served those verifications in order to give their litigation activity the patina of legitimacy.

44

156.   In addition, the Defendants have created fraudulent AR-1s, or caused them to be created, and have filed and served those AR-1s in order to give their collections arbitration the appearance of legitimacy.

157.   Furthermore, the Defendants knowingly have misrepresented and concealed facts in order to prevent Allstate from discovering that the psychology services were medically and psychologically unnecessary and performed pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted.

158.   What is more, the Defendants have created multiple professional corporations with different tax identification numbers in order to reduce the amount of billing submitted through any single professional corporation, thereby preventing Allstate from identifying the pattern of fraudulent charges submitted through any one entity.

159.   Allstate is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause Allstate to rely upon them. As a result, Allstate has incurred damages of more than one million ($1,000,000.00) dollars based upon the fraudulent charges representing payments made by Allstate on or after April 4, 2002, as well as more than two hundred fifty thousand ($250,000.00) dollars in arbitration fees that the Defendants have caused Allstate to incur.

160.   Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Allstate, Allstate did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against the PC Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

161.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 160 above.

162.    There is an actual case in controversy between Allstate and the PC Defendants regarding more than four hundred thousand ($400,000.00) dollars in fraudulent billing for psychology services that has been submitted to Allstate.

163.    The PC Defendants have no right to receive payment for any pending bills submitted to Allstate because they are fraudulently incorporated and are owned and controlled by persons not licensed to practice psychology in New York State and, therefore, are ineligible to seek or recover No-Fault Benefits.

164.    The PC Defendants have no right to receive payment for any pending bills submitted to Allstate because the professional corporations engaged in unlawful fee-splitting with unlicensed individuals and entities.

165.    The PC Defendants have no right to receive payment for any pending bills submitted to Allstate because the billed-for services were not medically or psychologically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the unlicensed individuals and entities that own and control the PC Defendants in contravention of New York law, and in many cases were not performed at all.

166.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     HK Psychological, P.C., Kingshwy Psychological, P.C., Omega Psychological, P.C., and Jay Psychological, P.C. have no right to receive payment for any pending bills submitted to Allstate because these professional corporations are fraudulently incorporated, owned and/or controlled by non-psychologists and, therefore, are ineligible to seek or recover No-Fault Benefits;

(ii)    HK Psychological, P.C., Kingshwy Psychological, P.C., Omega Psychological, P.C., and Jay Psychological, P.C. have no right to receive payment for any pending bills submitted to Allstate because these professional corporations engaged in unlawful fee-splitting with non-psychologists; and

(iii)   HK Psychological, P.C., Kingshwy Psychological, P.C., Omega Psychological, P.C., and Jay Psychological, P.C. have no right to receive payment for any pending bills submitted to Allstate because the billed-for services were not medically or psychologically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the unlicensed individuals and entities that own and control the PC Defendants in contravention of New York law, and in many cases were not performed at all.

### SECOND CAUSE OF ACTION
**Against the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

167.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 166 above.

168.    HK Psychological, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

169.    Adler, Gormakh, M. Gormakh, Kerner, and Matatov knowingly conducted and/or participated, directly or indirectly, in the conduct of HK's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills, on a continuous basis for more than four years, seeking payment for psychology services that HK was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated through identity theft and owned and controlled by non-

47

psychologists; (ii) it engaged in fee-splitting with non-psychologists; and (iii) the billed-for services were not medically or psychologically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the unlicensed individuals and entities that own and control HK in contravention of New York law, and generally were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

170.    HK's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which the Management Defendants operate HK, insofar as HK never has been eligible to bill for or collect No-Fault Benefits, was fraudulently incorporated through identity theft, and acts of mail fraud therefore are essential in order for HK to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity. In addition, HK is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-psychologists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. HK likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by HK in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

171.    The Defendants have submitted more than seven hundred thousand ($700,000.00) dollars in bills through HK as of the date of this Complaint and continue to attempt collection on the fraudulent billing.

172.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least four hundred eighteen thousand ($418,000.00) dollars pursuant to the fraudulent bills submitted by the Defendants through HK. In addition, Allstate has been forced to pay non-refundable fees to the AAA based on the fraudulent HK arbitration filings submitted by or on behalf of the Defendants in an amount to be determined at trial, but believed to exceed one hundred thousand ($100,000.00) dollars.

173.    By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### Against the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

174.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 173 above.

175.    HK Psychological, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

176.    Adler, Gormakh, M. Gormakh, Kerner, and Matatov are employed by and/or associated with the HK enterprise.

177.    The Management Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the HK enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail

fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills, on a continuous basis for more than four years, seeking payment for psychology services that HK was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated through identity theft and owned and controlled by non-psychologists; (ii) it engaged in fee-splitting with non-psychologists; and (iii) the billed-for services were not medically or psychologically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the unlicensed individuals and entities that own and control HK in contravention of New York law, and generally were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1." Each such mailing was made in furtherance of the mail fraud scheme.

178.    The Management Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

179.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least four hundred eighteen thousand ($418,000.00) dollars pursuant to the fraudulent bills submitted by the Defendants through HK. In addition, Allstate has been forced to pay non-refundable fees to the AAA based on the fraudulent HK arbitration filings submitted by or on behalf of the Defendants in an amount to be determined at trial, but believed to exceed one hundred thousand ($100,000.00) dollars.

180.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against HK and the Management Defendants**
**(Common Law Fraud)**

181.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 180 above.

182.    HK, Adler, Gormakh, M. Gormakh, Kerner, and Matatov intentionally and knowingly made false and fraudulent statements of material fact to Allstate and concealed material facts from Allstate in the course of their submission of hundreds of fraudulent bills seeking payment for psychology services.

183.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that HK is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it is fraudulently incorporated through identity theft and actually owned and controlled by non-psychologists; (ii) in every claim, the representation that HK is properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engages in illegal fee-splitting with non-psychologists; and (iii) in every claim, the representation that the billed-for services were medically or psychologically necessary, when in fact the billed-for services were not medically or psychologically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the unlicensed

individuals and entities that own and control HK in contravention of New York law, and generally were not performed at all.

184.    The Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges submitted by or through the Defendants that were not compensable under the No-Fault Laws.

185.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least four hundred eighteen thousand ($418,000.00) dollars pursuant to the fraudulent bills submitted by the Defendants through HK. In addition, Allstate has been forced to pay non-refundable fees to the AAA based on the fraudulent HK arbitration filings submitted by or on behalf of the Defendants in an amount to be determined at trial, but believed to exceed one hundred thousand ($100,000.00) dollars.

186.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

187.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against HK and the Management Defendants**
**(Unjust Enrichment)**

188.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 187 above.

189.    As set forth above, HK, Adler, Gormakh, M. Gormakh, Kerner, and Matatov have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

190.    When Allstate paid the bills and charges submitted by or on behalf of HK for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

191.    HK and the Management Defendants have been enriched at Allstate's expense by Allstate's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

192.    Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

193.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of four hundred eighteen thousand ($418,000.00) dollars.

## SIXTH CAUSE OF ACTION
### Against the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

194.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 193 above.

195.    Kingshwy Psychological, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

196.    Adler, Gormakh, M. Gormakh, Kerner, and Matatov knowingly conducted and/or participated, directly or indirectly, in the conduct of Kings' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills, on a continuous basis for more than 10 months, seeking payment for psychology services that Kings was not eligible to receive under the No-Fault Laws because: (i)

it was unlawfully incorporated and owned and controlled by non-psychologists; (ii) it engaged in fee-splitting with non-psychologists; and (iii) the billed-for services were not medically or psychologically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the unlicensed individuals and entities that own and control Kings in contravention of New York law, and generally were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

197.   Kings' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which the Management Defendants operate Kings, insofar as Kings never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Kings to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity. In addition, Kings is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-psychologists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Kings likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by Kings in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

198.    The Defendants have submitted more than one hundred eighty three thousand ($183,000.00) dollars in bills through Kings as of the date of this Complaint and continue to attempt collection on the fraudulent billing.

199.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least ninety-five thousand ($95,000.00) dollars pursuant to the fraudulent bills submitted by the Defendants through Kings. In addition, Allstate has been forced to pay non-refundable fees to the AAA based on the fraudulent Kings arbitration filings submitted by or on behalf of the Defendants in an amount to be determined at trial, but believed to exceed twenty-five thousand ($25,000.00) dollars.

200.    By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
### Against the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

201.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 200 above.

202.    Kingshwy Psychological, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

203.    Adler, Gormakh, M. Gormakh, Kerner, and Matatov are employed by and/or associated with the Kings enterprise.

204.    The Management Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Kings enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail

fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills, on a continuous basis for more than 10 months, seeking payment for psychology services that Kings was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated through identity theft and owned and controlled by non-psychologists; (ii) it engaged in fee-splitting with non-psychologists; and (iii) the billed-for services were not medically or psychologically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the unlicensed individuals and entities that own and control Kings in contravention of New York law, and generally were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2." Each such mailing was made in furtherance of the mail fraud scheme.

205.    The Management Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

206.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least ninety-five thousand ($95,000.00) dollars pursuant to the fraudulent bills submitted by the Defendants through Kings. In addition, Allstate has been forced to pay non-refundable fees to the AAA based on the fraudulent Kings arbitration filings submitted by or on behalf of the Defendants in an amount to be determined at trial, but believed to exceed twenty-five thousand ($25,000.00) dollars.

207.   By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Kings and the Management Defendants
### (Common Law Fraud)

208.   Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 207 above.

209.   Kings, Adler, Gormakh, M. Gormakh, Kerner, and Matatov intentionally and knowingly made false and fraudulent statements of material fact to Allstate and concealed material facts from Allstate in the course of their submission of hundreds of fraudulent bills seeking payment for psychology services.

210.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Kings is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it is fraudulently incorporated through identity theft and actually owned and controlled by non-psychologists; (ii) in every claim, the representation that Kings is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engages in illegal fee-splitting with non-psychologists; and (iii) in every claim, the representation that the billed-for services were medically or psychologically necessary, when in fact the billed-for services were not medically or psychologically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the unlicensed

individuals and entities that own and control Kings in contravention of New York law, and generally were not performed at all.

211.    The Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges submitted by or through the Defendants that were not compensable under the No-Fault Laws.

212.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least ninety-five thousand ($95,000.00) dollars pursuant to the fraudulent bills submitted by the Defendants through Kings. In addition, Allstate has been forced to pay non-refundable fees to the AAA based on the fraudulent Kings arbitration filings submitted by or on behalf of the Defendants in an amount to be determined at trial, but believed to exceed twenty-five thousand ($25,000.00) dollars.

213.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

214.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Kings and the Management Defendants**
**(Unjust Enrichment)**

215.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 214 above.

216.    As set forth above, Kings, Adler, Gormakh, M. Gormakh, Kerner, and Matatov have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

217.    When Allstate paid the bills and charges submitted by or on behalf of Kings for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

218.    Kings and the Management Defendants have been enriched at Allstate's expense by Allstate's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

219.    Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

220.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of ninety-five thousand ($95,000.00) dollars.

### TENTH CAUSE OF ACTION
#### Against HK, Kings, and the Management Defendants
#### (Violation of RICO, 18 U.S.C. § 1962(c))

221.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 220 above.

222.    HK, Kings, Adler, Gormakh, M. Gormakh, Kerner, and Matatov (the "HK-Kings Enterprise") constitute an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the HK-Kings Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically: (i) the Management Defendants provided the idea, financing, and operational

management necessary to carry out the fraudulent scheme, and stole Dr. Kaplan's identity to facilitate the scheme; and (ii) HK and Kings ostensibly are independent entities – with different names and tax identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to Allstate. The HK-Kings Enterprise has been operated under two separate corporate names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of Allstate and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one company. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the HK-Kings Enterprise acting singly or without the aid of each other.

223.    The HK-Kings Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to Allstate and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

224.    HK, Kings, Adler, Gormakh, M. Gormakh, Kerner, and Matatov each was employed by and/or associated with the HK-Kings Enterprise.

225.   HK, Kings, Adler, Gormakh, M. Gormakh, Kerner, and Matatov knowingly have conducted and/or participated, directly or indirectly, in the conduct of the HK-Kings Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that HK and Kings were not eligible to receive under the No-Fault Laws because: (i) they were unlawfully incorporated through identity theft and owned and controlled by non-psychologists; and (ii) they engaged in fee-splitting with non-psychologists; and (iii) the billed for services were not medically or psychologically necessary and were performed – to the extent they were performed at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" and "2."

226.   The Defendants submitted the fraudulent billing, or caused it to be submitted, on a continuous basis for more than four years. Furthermore, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Defendants are attempting collection on the fraudulent billing to the present day. Moreover, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

227.   The HK-Kings Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which HK, Kings, Adler, Gormakh, M. Gormakh, Kerner,

61

and Matatov operate the HK-Kings Enterprise, insofar as HK and Kings never have been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for the HK-Kings Enterprise to function. In addition, the HK-Kings Enterprise is engaged in inherently unlawful acts, inasmuch as HK's and Kings' very corporate existence is an unlawful act, considering that they are fraudulently incorporated, owned and controlled by non-psychologists, and their existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. The HK-Kings Enterprise likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by the HK-Kings Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

228.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least five hundred thirteen thousand ($513,000.00) dollars pursuant to the fraudulent bills submitted by the Defendants through HK and Kings. In addition, Allstate has been forced to pay non-refundable fees to the AAA based on the fraudulent HK and Kings arbitration filings submitted by or on behalf of the Defendants in an amount to be determined at trial, but believed to exceed one hundred twenty-five thousand ($125,000.00) dollars.

229.    By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
**Against HK, Kings, and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

230.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 229 above.

231.    HK, Kings, Adler, Gormakh, M. Gormakh, Kerner, and Matatov knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the HK-Kings Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit hundreds of fraudulent bills to Allstate. These acts of mail fraud include, but are not limited to, those that are described in the charts annexed hereto as Exhibits "1" and "2."

232.    Each member of the HK-Kings Enterprise knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

233.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least five hundred thirteen thousand ($513,000.00) dollars pursuant to the fraudulent bills submitted by the Defendants through HK and Kings. In addition, Allstate has been forced to pay non-refundable fees to the AAA based on the fraudulent HK and Kings arbitration filings submitted by or on behalf of the Defendants in an amount to be determined at trial, but believed to exceed one hundred twenty-five thousand ($125,000.00) dollars.

234.   By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### TWELFTH CAUSE OF ACTION
**Against Dr. Seitz and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

235.   Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 234 above.

236.   Jay Psychological, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

237.   Dr. Seitz, Adler, Gormakh, M. Gormakh, Kerner, and Matatov knowingly conducted and/or participated, directly or indirectly, in the conduct of JayPsych's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills, on a continuous basis for more than two years, seeking payment for psychology services that JayPsych was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-psychologists; (ii) it engaged in fee-splitting with non-psychologists; and (iii) the billed-for services were not medically or psychologically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the unlicensed individuals and entities that own and control JayPsych in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."

238.    JayPsych's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Seitz and the Management Defendants operate JayPsych, insofar as JayPsych never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for JayPsych to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity. In addition, JayPsych is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-psychologists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. JayPsych likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by JayPsych in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

239.    The Defendants have submitted more than four hundred ninety-eight thousand ($498,000.00) dollars in bills through JayPsych as of the date of this Complaint and continue to attempt collection on the fraudulent billing.

240.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least four hundred thirty-four thousand ($434,000.00) dollars pursuant to the fraudulent bills submitted by the Defendants through JayPsych. In addition, Allstate has been forced to pay non-refundable fees to the AAA based on the fraudulent